**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

OLIVER MCWILLIAMS,      )
                          )
        Plaintiff,        )
                          )
v.                      )      Case No. 04-1018-WEB
                          )
RUSKIN COMPANY,       )
                          )
        Defendant.     )

<u>MEMORANDUM AND ORDER</u>

Now before the Court is Defendant's motion for summary judgment.  Fed. R. Civ. P. 56;

(Doc. 74).  Plaintiff alleges racial discrimination in violation of Title VII of the Civil Rights Act of

1964, as amended, and 42 U.S.C. § 1981.  See 42 U.S.C. § 2000e et seq.  The Court has jurisdiction

pursuant to 42 U.S.C. § 2000e-5 and 28 U.S.C. § 1331.

<u>I.  Standard.</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "One of the

principal purposes of summary judgment is to isolate and dispose of factually unsupported claims..."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986). The Court views the evidence and all

reasonable inferences in favor of the non-moving party.  *Thiessen v. Gen. Elec. Capital Corp.*, 267

F.3d 1095, 1108 (10th Cir. 2001).  A fact is "material" if under the substantive law it is essential to

the proper disposition of the claim."  *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)).

"An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could

resolve the issue either way."  *Id.*  A genuine factual dispute requires more than a mere scintilla of

evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler,* 144 F.3d at 670-671. The movant can do this by demonstrating a lack of evidence on an essential element of the nonmovant's claim. *Id.* at 671. "If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citing Fed. R. Civ. P. 56(e)).

"To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F. 3d at 671 (internal citations and quotations omitted). The nonmoving party cannot defeat a properly supported motion for summary judgment by relying on conclusory allegations; rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson*, 477 U.S. at 256.

"[A]s previously noted in this district, 'the particular forms of evidence mentioned in [Rule 56] are not the exclusive means of presenting evidence on a [summary judgment] motion. The court may consider any material that would be admissible or usable at trial.'" *Arceo v. City of Junction City,* 182 F. Supp. 2d 1062, 1080 (D. Kan. 2002) (quoting *Wright v. Wyandotte County Sheriff's Dept.,* 963 F. Supp. 1029, 1035 (D. Kan. 1997)).

## II.. Facts.

1.  Plaintiff, Oliver McWilliams ("McWilliams"), is a black male.  (Doc. 72 ¶ 4.a.2.).

2.  Plaintiff was employed by Defendant Ruskin Company ("Ruskin") during the period of from September 24, 1984 until March 17, 2003.  (Doc. 72 ¶ 4.a.14.).

3.  Ruskin is a corporation doing business within the State of Kansas and having plants in Parsons (Labette County) and Galesburg (Neosho County). (Id. ¶ 4.a.15.).  Ruskin manufactures louvers, which are industrial air flow dampers used to control fires.  (Id. ¶ 4.a.16.).

4.  Ruskin's records show McWilliams was given a written warning for improper conduct described as "verbally abusive in the sense of snide and aggressive verbal communication with employees under his leadership" on April 21, 1995.  (Doc. 72 ¶ 4.a.17.).  Plaintiff did not receive this notice.  (Pl. Ex. 6 at 8: 11- 9:11); (Def. Ex. D000152).

5.  Because of complaints regarding McWilliams by coworkers for whom he served as the lead person and with the agreement of the union, McWilliams was removed from his position as lead person effective July 11, 1995, but later again became lead person.  (Doc. 72 ¶ 4.a.18.).  Plaintiff claims he was not told he was demoted for this reason.  (Pl. Ex. 6 at 8: 11- 9:11).

6.  In June of 1997, Ruskin received a written complaint from employee Sherry Parker, wife of Frank Parker ("Parker") of many instances of sexual harassment by McWilliams.  (Doc. 72 ¶ 4.a.19.); (Def. Ex. D000098-99).

7.  On or about June 30, 1997, Bob Carey issued a memorandum to McWilliams regarding the sexual harassment complaint by Sherry Parker, advising him that Ruskin had investigated the compliant and had determined that McWilliams had made certain sexually harassing comments to Mrs. Parker and advising McWilliams that he had been given a three day suspension without pay because of these comments.  Ruskin delivered a copy of that memorandum and a copy of the Ruskin

Policy Against Discrimination/Harassment to McWilliams.  (Doc. 72 ¶ 4.a.20.); (Def. Ex. D000139, D000098-99).  After Ruskin began to investigate Mrs. Parker's allegations against Plaintiff for sexual harassment, McWilliams reported to Ruskin that Parker also had made an inappropriate comment about Mrs. Parker; however, Parker only received a written warning.  (Pl. Ex. 6 at 14:9 - 15:14).  Plaintiff asserts he was disciplined for Parker's behavior; however, the stipulated and uncontroverted facts show Plaintiff made inappropriate comments to Mrs. Parker and was disciplined for those comments.  (Doc. 72 ¶ 4.a.20.); (Def. Ex. D000139, D000098-99); (Def. Ex. CC  ¶ 5).

8.  Ruskin issued a written warning dated December 20, 2000 to McWilliams for improper conduct arising from an incident wherein Ruskin supervisor Greg Brynds claimed that McWilliams was flipping off Greg Brynds.  (Doc. 72 ¶ 4.a.21.).  Plaintiff denies flipping off Greg Brynds.  (Pl. Ex. 6 at 31: 1-4).

9.  On or about March 14, 2002, Bob Carey issued a written warning to McWilliams for insubordination arising from an incident where Plaintiff's supervisor Greg Brynds claimed that McWilliams told Brynds twice "to get the hell out of here".  (Doc. 72  ¶ 4.a.22.).  Plaintiff denies he told Brynds "to get the hell out of here".  (Pl. Ex. 6 at 111: 12-13).

10.  On March 11, 2003, McWilliams exchanged words with co-worker Frank Parker during work time at Defendant's facility in Parsons, Kansas.  (Doc. 72 ¶ 4.a.23.).  Parker said to McWilliams, "it must be break time"; however, Plaintiff claims he was busy putting tools away.  (Pl. Ex. 6 at 52: 7-16, 54: 8-18); (Def. Ex. BB ¶ 7).  Parker allegedly began taunting Plaintiff with references to "yo mama".  (Pl. Ex. 6 at 54: 8-18).  Plaintiff understood "yo mama" to mean "your mother".  (Id. at 55: 2-18).  McWilliams knocked off Parker's glasses and then Parker knocked off

4

Plaintiff's glasses.  (Doc. 72 ¶ 4.a.23.).

11.   There is a substantial dispute of testimony regarding what occurred next; however, it is undisputed that a fight occurred between McWilliams and Parker.  (Doc. 72 ¶ 4.a.24.).  The Court will assume Plaintiff's specific supported facts are true.

12.   After the altercation, Plaintiff went to management to report the incident; however, as Plaintiff walked by Parker, Parker rushed ahead to the office door.  (Pl. Ex. 6 at 57: 21 - 58: 8). Plaintiff attempted to walk past Parker and asked Parker to please move out of the way.  (Pl. Ex. 6 at 58: 8-10).  Plaintiff's hand slipped off Parker's shoulder and poked him in the neck.  (Pl. Ex. 6 at 58: 15-16, 67: 15-18).  Parker then hit Plaintiff three times with a closed fist in the face and kicked Plaintiff.  (Pl. Ex. 6 at 58: 19 - 59: 19).[1]  While Plaintiff was on the ground, Parker said "I can't believe that mother f_____ hit me".  (Pl. Ex. 6 at 60: 22- 61: 4).  As a result of the fight, Plaintiff was hurt, dazed, and nearly unconscious.  (Pl. Ex. 59: 17-19, 66: 3-8).  Butch Camper observed Plaintiff on the ground and Parker was on top of him.  (Def. Ex. D000053).  Butch helped Plaintiff up but could not tell that Plaintiff had been hit; however, he could definitely tell Parker had been hit. (Def. Ex. D000053).  Parker is larger and younger than Plaintiff.  (Pl. Ex. 10, No. 21-22).

13.   Within five to ten minutes after the altercation between McWilliams and Parker, McWilliams was called into the office and was questioned by Delmer Fisher (Ruskin Plant Manager) and Gail Alloway (Ruskin Plant Superintendent).  (Doc. 72 ¶ 4.a.26.).

14.  The contemporaneous notes taken by Alloway as part of Ruskin's investigation indicate

---

[1] Plaintiff alleges Parker bragged about beating him up; however, Plaintiff did not hear this personally and testified only to what he heard around town.  The Court will not consider inadmissible hearsay.  See *Starr v. Pearle Vision,* 54 F.3d 1548, 1555 (10th Cir. 1995) (Rule 56 precludes the use of inadmissible hearsay testimony in depositions submitted for summary judgment).

that when McWilliams was interviewed by Delmer Fisher ("Fisher"), he told Fisher that there

"wasn't any problem" - "it wasn't nothing."  (Doc. 72 ¶ 4.a.27.).

15.  McWilliams told Fisher and Alloway that he (McWilliams) was on his way to get some

parts and Parker said something about his mama and they had an argument. McWilliams repeatedly

said he did not hit anybody, that nobody hit him, and that he was not on the floor.  (Doc. 72 ¶

4.a.28.).

16.  Fisher and Alloway also interviewed Parker on March 11, 2003 who provided the

following information:

> a. Parker stated that he and McWilliams were coming to the office to talk about a problem
> they were having and that McWilliams turned around and hit Parker in the jaw. Parker
> asked McWilliams "what the f____ he was doing." Parker claimed that McWilliams hit him
> in the side of the jaw a second time and that Parker responded by pushing McWilliams
> into the wall and into the bathroom door.

> b. When asked what started the argument, Parker told Fisher and Alloway that McWilliams
> had been standing by the back door at the lunch hour when McWilliams was supposed to be
> in his (McWilliams') area, that Parker commented that it must be lunch time that and
> McWilliams heard the comment, walked over and slapped Parker's glasses off his face, and
> that Parker then slapped McWilliams' glasses off his face. Parker told Fisher and Calloway
> that McWilliams then said "Let's go outside," and that Parker told him "whatever he wanted
> to do." Parker then claimed that Oliver McWilliams left and that Parker thought that was the
> end of it. Later, Parker was in the maintenance area by the computer and McWilliams
> walked up and said let's go outside or in the office, "Let's get this settled." Parker told him
> "whatever you want to do," and they started for the office and he thought they were coming
> to talk to Fisher and Alloway about it and "That's when the hitting started."
> (Doc. 72 ¶ 4.a.29.).

17.  Jay Schreppel also was interviewed by Alloway and Fisher on March 11, 2003.

Schreppel heard Parker yell "this f____er hit me." Then Schreppel heard Parker yell again "he

f_____in hit me." Schreppel stated that after the altercation, Parker told him that McWilliams had

hit him twice and that Parker then shoved McWilliams into the bathroom.  (Doc. 72 ¶ 4.a.30.).

18. Alloway and Fisher next interviewed Mary Jo Fitzwater on March 11, 2003. Ms.

Fitzwater's desk was in an office near where the fight occurred. Ms. Fitzwater reported that she was on the phone with Fed-Ex and heard Frank Parker yell "the f____er hit me." She said she next heard Parker yell: "the f____er hit me twice.".  (Doc. 72 ¶ 4.a.31.).

19.  Alloway and Fisher next interviewed Kent Schenker on March 11, 2003. Mr. Schenker was in a nearby conference room training on software during the incident. Schenker stated that he heard Parker yell "he hit me, he f___in hit me.".  (Doc. 72 ¶ 4.a.32.).

20.  At no time during Fisher and Calloway's March 11, 2003 interview of McWilliams did he state that Parker hit him. Rather, at all times, McWilliams denied that there had been any fight. (Doc. 72 ¶ 4.a.33.).

21.  On March 11, 2003, McWilliams did not tell Fisher or Alloway that he needed or wanted any medical care and did not tell them he was impaired.  (Doc. 72 ¶ 4.a.34.).  However, Plaintiff alleges that he does not remember any questions or answers during the interview because he was dazed.  (Def. Ex. 6 at 71: 1-24.)  After the investigative meeting of March 11, 2003, McWilliams drove himself home in his car.  (Doc. 72 ¶ 4.a.43.).

22.  Ruskin has a policy against discrimination and harassment which was posted on the company bulletin board in the lunch room during all of  2003 and prior to that.  (Doc. 72 ¶ 4.a.35.).

23.  Ruskin's shop rules, revised February 1997, provide that the Company reserves the right to administer disciplinary action up to and including discharge of any employee who is in violation of the following: "17. Fighting on Company property at any time".  Theses shop rules were posted on the Ruskin bulletin board at Parsons, Kansas where McWilliams worked during all of 2003 and prior to that.  (Doc. 72 ¶ 4.a.36.).; (Def. Ex. D00856).

24.  On March 17, 2003, a meeting was held at the Ruskin offices and McWilliams was

advised by Fisher that, based on its investigation, the Company concluded that McWilliams was the aggressor and had hit Parker twice and that McWilliams would be discharged effective March 17, 2003.  (Doc. 72 ¶ 4.a.38.); (Def. Ex. C ¶ 12).  Fisher considered Plaintiff's disciplinary history involving a pattern of hostile conduct when making the decision to fire Plaintiff.  (Def. Ex C ¶ 12).  For Parker's role in the altercation with McWilliams, Parker was suspended without pay for five days.  (Doc. 72 ¶ 4.a.45.).  Plaintiff did not claim he had been hit by Parker during this meeting. (Def. Ex. C ¶ 14).

25.  A grievance meeting was held at approximately 1:45 p.m. on April 22, 2003 which was attended by McWilliams, Union Representative Jackie Hall, Union Representative Joe Cervantes, Corkey Robinson, Union Representative Westoff, co-worker Nat Ingram, Delmer Fisher, Bob Carey and Gail Alloway. For the first time at that grievance meeting, Plaintiff claimed that Parker had hit him.  (Doc. 72 ¶ 4.a.39.).  Ruskin denied the grievance and the matter proceeded to arbitration. (Doc. 72 ¶ 4.a.40.).

26. An arbitration hearing was held on January 20, 2004 regarding whether Ruskin had good cause to terminate McWilliams' employment.  (Doc. 72 ¶ 4.a.41.).  The arbitrator concluded in his decision that there was no support for McWilliams' story - "told for the first time at the arbitration - that Parker beat him so senseless he was unable to communicate clearly.  Indeed, grievant was not silent at the March 11 investigation. His explanation was that no fight occurred. That was purposeful and pure fabrication".  (Doc. 72 ¶ 4.a.42.).

27. The arbitrator concluded: "In short, Grievant was the aggressor in both encounters. He lied in his first and subsequent accounts. Even at the hearing, he expressed no regret. There is potential risk violent behavior will re-occur and, perhaps, escalate if Grievant returns the

8

workplace". (Doc. 72 ¶ 4.a.44.). The arbitrator also stated about Parker: "[w]ithout question, Parker was no innocent victim on march 11 for the baiting annoyances that preceded it. Nonetheless, his March 11 misconduct was less grievous because he kept his antagonizes verbal. He did not initiate hostile touching or start violent contact with another employee. Once a serious attack began, there is convincing evidence he acted beyond acceptable self-defense.". (Def. Ex. A).

28. McWilliams testified at his deposition that he is not aware of any facts that lead him to believe that Fisher and Bob Carey did not think that McWilliams was the aggressor in the altercation with Parker. (Doc. 72 ¶ ¶ 4.a.46, 47.).

29. Plaintiff testified at his deposition that he believes that Fisher and Bob Carey thought that he, McWilliams, was lying and that Parker was telling the truth about the altercation between McWilliams and Parker. (Doc. 72 ¶ 4.a.48.).

30. McWilliams testified at his deposition that he is not aware of any facts that lead him to believe that Mike Shah did not think that the fight between McWilliams and Parker was McWilliams' fault rather than Parker's fault. (Doc. 72 ¶ 4.a.49.).

31. Management at Ruskin, including Bob Carey believed Parker's account, and not Plaintiff's account, of the March 11, 2003 altercation between them. (Doc. 72 ¶ 4.a.50.); (Pl. Ex. 6 at 91: 23- 92: 4).

32. As of December 31, 2003, after McWilliams' termination, Ruskin employed 14 African American production workers out of a total of 265 among its production workers (McWilliams was classified as a production worker) at Ruskin's Parsons and Galesburg, Kansas facilities. A majority of these African American production workers were hired by Bob Carey. (Doc. 72 ¶ 4.a.51.).

33. The number of blacks working as production workers for Ruskin in 2003 was 14 out of

265 total production employees at the Parsons and Galesburg Ruskin plants or 5% of the employees. (Doc. 72 ¶ 4.a.52.).

34.  Ruskin's Parsons facility is located in Labette County, Kansas and its Galesburg facility is located in Neosho County, Kansas. According to information gathered and published by the U.S. Census Bureau for 2000 regarding the percentage of persons in Labette and Neosho Counties in Kansas who are Black, which information is available on the internet at http://quickfacts.census.gov/qfd/states/20/20133.html. and at http://quickfacts.census.gov/qfd/states/20/20099.html under the heading U.S. Census Bureau Kansas Quick Facts, was respectively, 4.7% and 0.9%.  (Doc. 72 ¶ 4.a.53.).

35.  Plaintiff was qualified for the position of Lead prior to his physical alteration with Parker.  (Doc. 72 ¶ 4.a.6.).

36.  Plaintiff's position was not eliminated after his termination.  (Doc. 72 ¶ 4.a.7.).

37.  After Plaintiff was discharged, Ruskin replaced him by promoting Louis McWilliams, his brother and a black employee, into Plaintiff's former position.  (Doc. 72 ¶ 4.a.8.).  Louis McWilliams was selected over two white employees who were also considered for the position. (Def. Ex. B ¶ 34).

38.  Plaintiff alleges Bob Carey is a racist because Carey told Plaintiff he does not approve of interracial dating.  (Pl. Ex. 6 at 96: 12-22).

39.  Plaintiff has suffered the following negative effects as a result of his termination: his children cry, his grandson has stopped asking him for money, and his wife has been forced to use generic brands of medicine.  (Pl. Ex. 6 at 126: 4-25).

40.  Ruskin has not had a black employee in front office management in at least 19 years.

(Pl. Ex. 6 at 188: 4-21); (Pl. Ex. 8).  Ruskin provides evidence that no black person has applied for a position in the front office management in 20 years.  (Def. Ex. CC ¶ 9).

41.  The Kansas Human Rights Commission ("KHRC") issued a probable cause finding as to discrimination.  (Pl. Ex. 14).

42.  Plaintiff is the only black employee to be involved in a physical altercation or fight at Ruskin's Parsons or Galesburg plants since January 1, 2000.  (Doc. 72 ¶ 4.a.4.).  Plaintiff is the only black employee to be disciplined for fighting since January 1, 2000.  (Doc. 72 ¶ 4.a.5.).

43.  Terry Lungsford, a Ruskin employee, stated that Parker had threatened to fight him.  (Pl. Ex. 6 at 149: 10-22).  Parker had problems with numerous employees because he was a jokester.  (Pl. Ex. 6 at 13: 2-4).

44.  James Wimp is a white employee at Ruskin and was involved in a physical altercation in 1982, for which he was suspended for three days.  (Pl. Ex. 10, No. 35); (Pl. Ex. 5).  In that altercation, Wimp shoved but did not hit another employee.  (Def. Ex. EE ¶ 3).  Wimp was a lead at the time he was disciplined.  (Pl. Ex. 10, No. 35).

45.  Larry Boudreaux ("Boudreaux"), a white employee, was involved in a physical altercation and received a suspension of three days.  (Pl. Ex. 15 at 2-3).  This incident involved Boudreaux putting his hands on another employee and pushing him.  (Id); (Doc. 72 ¶ 4.a.57.).  Boudreaux was not a Lead at the time he was disciplined for being involved in a physical altercation (Doc. 72 ¶ ¶ 4.a.9, 10, 12, 13.).

46.  McWilliams admitted in his deposition that he does not have any knowledge as to whether Larry Bourdeaux was somehow treated better than McWilliams.(Doc. 72 ¶ 4.a.56.).  McWilliams has no personal knowledge of and has not seen a white employee involved in a physical

altercation who was suspended rather than terminated.  (Doc. 72 ¶ 4.a.55.).

47.  Fisher and Mike Shah, with input from Bob Carey made the decision to terminate Plaintiff.  (Def. Ex. B ¶¶ 14, 16); (Def. Ex. C ¶ 12); (Def. Ex. E ¶ 3); (Pl. Ex. 5).  Delmar Fisher also approved the disciplinary action against Wimp.  (Pl. Ex. 5).

### III.  Admissibility of Evidence in Opposition to Summary Judgment.

In opposition to summary judgment, Plaintiff relies on the investigation by the KHRC which contains out of court statements by a union representative, Mr. Cervantes.  Mr. Cervantes allegedly told the KHRC investigator that he thought Plaintiff was treated racially different; that the EEOC investigator was uninterested in his comments; and he knew of white employees who had fought but received less severe punishment.  (Pl. Ex. 13).  Defendant objects to the use of these statements as inadmissible hearsay.

Under the public records exception to the hearsay rule, the report of the KHRC would normally be admissible; however, "[e]vidence reported in a government document is only admissible to the extent that the maker of the document could testify to that evidence were he present in court." *In re Air Crash Disaster at Stapleton Intern. Airport, Denver, Colo.,* 720 F. Supp. 1493, 1497 (D. Colo. 1989); Fed. R. Evid. 803(8)(C).

In this instance, the KHRC interviewer could not testify to what Mr. Cervantes said without violating the rule against hearsay.  Rule 805 mandates that each layer of hearsay be cured before admission as evidence; however, Plaintiff offers no exception to the hearsay rules for admission of Mr. Cervantes' statements.  Fed. R. Evid. 805.  Plaintiff states instead that he intends to call Mr. Cervantes at trial to cure any hearsay.  Plaintiff argues that the intention to produce admissible

evidence at trial is sufficient to allow the out of court statements to be considered in a summary judgment. *Minor v. Ivy Tech State College*, 174 F.3d 855 (7th Cir. 1999) (hearsay usable in summary judgment proceedings if it could be replaced at trial by admissible evidence).

The *Minor* case relied on *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997). *Eisenstadt* held that hearsay can be admitted to oppose summary judgment only in obvious cases where hearsay can be replaced at trial; for example, "a letter inadmissible only because the signature on it had not been verified and there was no doubt that it could and would be." *Id.*

In this case, Plaintiff has made no showing that the out of court statements in the KHRC interview could be readily replaced at trial. Plaintiff provides no deposition, affidavit, or any other evidence to support statements allegedly made to the KHRC interviewer. Furthermore, it is not obvious that Mr. Cervantes would give testimony consistent with the KHRC interview, as Defendant has provided an affidavit from Mr. Cervantes in which he makes statements contrary to those in the KHRC report; moreover, Mr. Cervantes states in his affidavit that he has no personal knowledge of fights between white employees.  (Def. Ex.GG ¶ 10).

In light of the unreliable nature of Mr. Cervantes' statements in the KHRC report, the *Minor* case is of no assistance to Plaintiff.  The Court will not consider the Mr. Cervantes' out of court statements in the KHRC report.  *Stolarczyk ex rel. Estate of Stolarczyk v. Senator Intern. Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 839 (N.D. Ill. 2005) (EEOC interviewer's notes containing out of court statements from other parties violated hearsay and not considered in summary judgment); see *Starr,* 54 F.3d at 1555 (Rule 56 precludes the use of inadmissible hearsay testimony in support of or opposition to summary judgment).

<u>IV. Governing Law and Analysis.</u>

"A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). Both parties agree there is no direct evidence of discrimination.

A plaintiff with only indirect evidence of discrimination may show discrimination through the test articulated by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under this test, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *Id.* at 802. Once plaintiff has met this burden, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the discharge. *Id.* If the defendant meets its burden, the plaintiff must then show that the defendant's justification is a mere pretext. *Id.* at 804. "While *McDonnell Douglas* involved a Title VII claim for failure to hire, the analytical framework it pioneered applies equally to claims brought pursuant to section 1981." *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999).

To make a prima facie case of discrimination, Plaintiff must "show that: (1) he belongs to a protected class; (2) he was qualified for his job; and (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." *Kendrick,* 220 F.3d at 1226 (quoting *McDonnell Douglas*, 411 U.S. at 802).

The stipulated facts show a prima facie case for discrimination. Plaintiff is black, qualified for his job, was discharged, and the position was not eliminated after his discharge. (Doc. 72 at 2-10 ¶ ¶ 2, 6, 7, 38). Defendant does not dispute that Plaintiff has made a prima facie case of

discrimination; consequently, the burden shifts to Defendant.  To satisfy this burden, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 257 (1981).

Ruskin states that it fired Plaintiff for being the aggressor in a fight with Parker.  Minutes after the fight, Ruskin management spoke with Plaintiff who said there "wasn't any problem" and "it wasn't nothing".  Defendant also interviewed Parker who gave a detailed account of what occurred.  Parker stated Plaintiff hit him twice.  This version of the fight was consistent with red marks on Parker's face as well as witnesses who stated they heard Parker say he'd been hit.  Six days after the fight, Fisher met with Plaintiff to inform him he was being discharged for his role as aggressor in the fight.  Plaintiff did not dispute the results of the investigation during this interview.

The Court is not required to determine what really happened during the fight; rather, the Court must determine if Defendant has offered a legitimate non-discriminatory reason for discharging McWilliams.  The Court finds that Defendant has met its burden by providing evidence that it believed Plaintiff was the aggressor during the fight and discharged him for that reason.

Plaintiff acknowledges Defendant's proffered reason for his termination but argues it was merely a pretext for racial discrimination.  "A plaintiff demonstrates pretext by showing either 'that a discriminatory reason more likely motivated the employer or...that the employer's proffered explanation is unworthy of credence.'" *Rea v. Martin Marietta Corp.,* 29 F. 3d 1450, 1455 (10th Cir. 1994) (quoting *Burdine,* 450 U.S. at 256).

> A plaintiff typically makes a showing of pretext in one of three ways:
> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with

evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

*Kendrick*, 220 F.3d at 1230 (internal citations omitted).

Plaintiff argues Defendant's reason is a pretext for discrimination because: similarly situated employees were treated differently; defendant's rules are subjective and not posted; racist remarks at work; statistics showing the absence of black employees in front office management; and the KHRC finding of probable cause for a termination based on race.

### A.  Similarly Situated Employees.

"An inference of discrimination may be raised by evidence that a plaintiff was...treated less favorably than similarly situated employees who are not in the plaintiff's protected class." *Hardy v. S.F. Phosphates LTD. Co.*, 185 F.3d 1076, 1082 (10th Cir. 1999) (quoting *Price v. S-B Power Tool*, 75 F.3d 362, 365 (8th Cir. 1996)). "Differential treatment not premised on rational business policy may in some instances support an inference of illegal discriminatory intent..." *David v. City and County of Denver,* 101 F.3d 1344, 13559-1360 (10th Cir. 1996).

"Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).  "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Id.*

### 1.  James Wimp.

Plaintiff claims James Wimp is a similarly situated employee of a non-protected group who

16

was treated differently for similar conduct.  Wimp and Plaintiff are both Leads.  There is evidence

that Fisher was involved in the disciplinary decisions for both Plaintiff and Wimp.  Wimp is a white

employee and was involved in a physical altercation in 1982, for which he was suspended for three

days.  In that altercation, Wimp shoved but did not hit another employee.

Defendant argues Wimp is not similarly situated because there is no evidence that Wimp's

disciplinary record was comparable to Plaintiff's.  Indeed, the facts show Plaintiff had numerous

complaints of insubordination and one complaint of sexual harassment and these were considered

in the decision to fire McWilliams.  While Plaintiff denies he did anything wrong, he stipulated to

the existence of these records which show he was reprimanded.  There is no evidence that Wimp had

such disciplinary problems prior to being disciplined for the physical altercation in 1982;

consequently, he is not a similarly situated employee.  See *Jordan v. Allgroup Wheaton,* 218 F.

Supp. 2d 643, 652 (D.N.J. 2002) (because there is no evidence that any of the individuals involved

in workplace disputes had a disciplinary record comparable to plaintiff's, this anecdotal evidence

that past quarrels between white employees resulted in less severe punishment fails to support an

inference of racial discrimination).  However, even if Wimp were a similarly situated employee,

Plaintiff does not provide facts to show a pretext for racial discrimination.

"When comparing the relative treatment of similarly situated minority and non-minority

employees, the comparison need not be based on identical violations of identical work rules;

however, the violations must be of comparable seriousness."  *English v. Colorado Dept. of

Corrections*, 248 F.3d 1002, 1011 (10th Cir. 2001).  Defendant believed Plaintiff struck Defendant

twice in the face.  The admissible evidence shows Wimp shoved but did not punch or hit another

individual.  Shoving is not of the same severity as multiple strikes to another's face; consequently,

Wimp's suspension is commensurate with his shoving.  Because Plaintiff's violation of the rule against fighting was more severe, his receipt of more severe punishment does not show a pretext. See *Id.* at 1012 (a similarly situated white employee's kissing of an inmate not as serious as plaintiff's sexual relations with an inmate; consequently, it is not evidence of pretext).

Ruskin also argues Wimp's fight is too remote in time to be probative of discrimination as it occurred 21 years before Plaintiff's discharge in 2003.  *Coleman v. Exxon Chem. Corp.*, 162 F. Supp. 2d 593, 626 (S.D. Tex. 2001) (promotion of white male in 1989 too remote to constitute probative evidence of race discrimination in 1995).  The Court agrees that disciplinary action over twenty years prior to the discharge decision at issue is not probative of discrimination as it is too remote in time to demonstrate pretext.  *Simms v. Oklahoma ex rel. Dept. of Mental health and Substance Abuse Services*, 165 F.3d 1321, 1331 (10th Cir. 1999) (white employees not disciplined in 1991 not sufficiently connected to employment decision in 1995 to show pretext).

### 2.  Lee Boudreaux.

Plaintiff acknowledges that Boudreaux is not similarly situated but argues that Ruskin's disciplinary actions for Boudreaux, a white employee, show racial discrimination.  The Court agrees with Plaintiff that Boudreaux is not similarly situated.

Unlike Plaintiff, Boudreaux, was not a Lead.   Plaintiff provides no evidence showing if Boudreaux had the same supervisor as Plaintiff or if Boudreaux had a similar disciplinary history. Furthermore, the admissible evidence shows Boudreaux's actions were not as severe as Plaintiff's as he merely pushed another person instead of hitting him.  Because Boudreaux is not a similarly situated employee, Ruskin's discipline of Boudreaux is insufficient to show a pretext for discrimination. *Poore v. Rooks County,* 34 F. Supp. 2d 1275, 1280 (D. Kan. 1999) (employees not

similarly situated do not create inference of discriminatory intent); *Burdine,* 450 U.S. at 258 (plaintiff has the burden to show employees are similarly situated).

> 3.  Parker.

Plaintiff next argues Parker was a similarly situated white employee, yet was treated differently for the same conduct in 1997 and 2003.

Assuming Parker was similarly situated with Plaintiff, the facts do not show that Parker and Plaintiff engaged in the same conduct in 1997.  Mrs. Parker complained of numerous instances of inappropriate remarks and touching by Plaintiff; however, McWilliams provides only one example of an inappropriate comment made by Parker.  Parker received a letter of warning and Plaintiff was suspended for three days without pay.  The unequal discipline reflects the different behavior and is not indicative of pretext. see *Kendrick,* 220 F.3d at 1232 (white employees verbal abuse towards supervisors a violation that is not of comparable seriousness as plaintiff's verbal and physical abuse of his supervisor).

Plaintiff also claims the discipline given to Parker after the fight in 2003 was unequal and shows pretext.  Plaintiff asserts that both he and Parker were disciplined for violating the policy against fighting; consequently, both should have received equal punishment.  Plaintiff relies on *Lewis v. Johnson Controls, Inc.,* 1997 WL 790597 (N.D. Ill. 1997).

In *Lewis,* a white employee verbally harassed a black employee and the black employee hit him; however, only the black employee was fired.  *Id.* at *5.  The defendant's rules required an immediate discharge of an employee for "[p]rovoking, instigating or participating in a fight on company property."  Id. * 1.  The Court held this disparate punishment was a pretext because both employees had violated the same rule.  *Id.* *5.

The Court disagrees that *Lewis* applies because Ruskin's rules are different.  In *Lewis*, the company acted contrary to its own rules which required discharge for provoking or participating in a fight.  In contrast, Ruskin's shop rules state "[t]he Company reserves the right to administer disciplinary action up to and including discharge any employee who is in violation of the following:...17. Fighting on Company property at any time."  (Def. Ex. D00856).  Unlike the defendant's actions in *Lewis*, Ruskin's different punishment of Plaintiff and Parker was within the framework of its own rules. *Cf. Mohammed v. Callaway*, 698 F.2d 395, 400-401 (10th Cir. 1983) (departure from employment criteria set out in job announcement which disadvantaged minority employee seeking promotion was probative of discrimination); *cf. Lucy v. Manville Sales Corp.*, 674 F. Supp. 1426 (D. Colo. 1987) (contrary to company policy, qualified black employee not interviewed even though other qualified white employees were interviewed and was evidence of pretext).

The Court disagrees that different violations of the same rule require uniform punishment. This argument is unpersuasive as "an employer has some discretion to consider all the facts and determine whether the discharge is an appropriate remedy or whether a milder punishment would be more appropriate."  *Kendrick v. Commission of Zoological Subdistrict,* 565 F.2d 524, 527 (8th Cir. 1977).  A mechanistic approach requiring the same punishment for all violations of the same rule irrespective of individual conduct would be contrary to the discretion reserved by Ruskin in its own rules and would prevent employers from being able to mete out appropriate discipline based on the circumstances.

Indeed, the disparate punishment can be explained by the differences in Plaintiff's and Parker's actions.  The information available to Ruskin upon Plaintiff's discharge was that he had

struck Parker twice initially and then Parker shoved him back.  While both Plaintiff and Parker

fought; two strikes to the face are more serious than a shove.  *English,* 248 F.3d at 1011(when

comparing the relative treatment of similarly situated employees, the comparison need not be based

on identical violations of identical work rules; however, the violations must be of comparable

seriousness).  Plaintiff's more severe punishment reflects his more severe violation of the rule

against fighting; therefore, it does not show a pretext for discrimination.


B.  Subjective criteria for punishment.

Plaintiff next argues that Ruskin's decision to discharge Plaintiff is pretextual because it is

subjective.  Plaintiff cites to Defendant's rules which do not indicate that being an aggressor or

throwing a certain number of punches will bring a stiffer punishment.

Evidence of pretext may include the use of subjective criteria.  *Simms,* 165 F.3d at 1331.

Indeed, "[c]ourts view with skepticism the use of subjective evaluations in making termination

decisions." *Plotke v. White*, 405 F.3d 1092, 1106 (10th Cir. 2005).  However, subjective criteria are

not wrongful per se.  *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981).  "The appropriate

inference to be drawn from the presence of subjective criteria varies with the facts of the case". *Id.*;

see *Greene v. Safeway Stores, Inc.,* 98 F.3d 554, 564 (10th Cir. 1996) (defendant discharged plaintiff

because he was pessimistic, intimidating, and a poor merchandiser and these subjective criteria were

pretextual because they conflicted with plaintiff's previous positive evaluations).

The Court does not find Ruskin's policy of harshly punishing aggressors or those who punch

as excessively subjective.  These criteria are subject to some objective criteria, such as a finding of

who struck whom first and whether it was with a fist or a push. *Cf. McCullough v. Real Foods, Inc.,*

140 F.3d 1123 (8th Cir. 1998) (promotion criteria of work ethic, ability, and dedication to job are excessively subjective).

Assuming *arguendo* these factors to be somewhat subjective, Plaintiff does not provide facts, as applied to the subjective criteria, to show any pretext for discrimination. Except for Plaintiff's general denial that a fight occurred, all other facts indicated Plaintiff acted as the physical aggressor by initially hitting Parker twice in the face. Parker's statement to Defendant's investigators, witnesses who heard the event, and red marks on Parker's face shortly after the fight were all consistent with Ruskin's conclusion about the fight. *Watts*, 270 F.3d at 1296 (existence of corroborating evidence, such as red marks on a face after a fight is crucial when an employer decides disciplinary action). A reasonable jury could not conclude that defendant's actions based on its subjective criteria were a pretext for discrimination. *Id.* at 1295 (10th Cir. 2001) (regardless of what actually happened, in determining the whether the proffered reason for a decision was pretextual, a court examines the facts as they appeared to the person who made the decision).

Plaintiff also argues Ruskin's policy of punishing aggressors more harshly is a pretext because this policy is not posted. Plaintiff's argument is meritless. "A plaintiff typically makes a showing of pretext in one of three ways:...(3) with evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff." *Kendrick,* 220 F.3d at 1230. As the above standard makes clear, it is not the existence of an unwritten rule that shows a pretext; rather, it is actions inconsistent with an unwritten rule that can be a pretext.


C.  Bob Carey and racist remarks.

22

Plaintiff next argues that Bob Carey has made racist remarks. "Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case". *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 (11th Cir. 1998). However, "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions." *Rea,* 29 F.3d at 1457 (quoting *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994)); see *Stewart v. Adolph Coors Co.*, 217 F.3d 1282, 1289 (10th Cir. 2000). "To show such animus, the plaintiff must demonstrate a nexus between the allegedly discriminatory statements and the defendant's decision to terminate [him]. A causal nexus can be shown if the allegedly discriminatory comments were directed at the plaintiff, [his] position, or the defendant's policy which resulted in the adverse action taken against the plaintiff." *Rea*, 29 F.3d at 1457.

Bob Carey allegedly told Plaintiff he did not like interracial dating between blacks and whites. Plaintiff does not allege that the remarks were directed at him as he does not allege he is in or has been in an interracial relationship. Moreover, the comment has nothing to do with Plaintiff's position as Lead or Defendant's policy on fighting. Plaintiff has also failed to give any details about the comment such as how many times and how long ago it was spoken. Consequently, this comment does not show that the decision to fire Plaintiff was motivated by his race.

D.  Statistics of Black Managers.

Plaintiff next argues that the absence of black employees in front office management positions for 19 years shows a pretext for discrimination in his discharge. According to Plaintiff, this statistic shows that black employees are kept at lower positions and indicates an environment

23

of prejudice at Ruskin.

"Evidence of pretext may include... the employer's policy and practice regarding minority employment (including statistical data)..." *Simms,* 165 F.3d at 1328.  The court holds that Plaintiff's statistical data are not probative of discrimination and do not support a finding of pretext.

"Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext." *Martinez v. Wyoming, Dept. Of Family Services,* 218 F.3d 1133, 1139 (10th Cir. 2000).  Plaintiff's statistics do not compare the qualifications and experience of white applicants for front office management with black applicants who were not selected. see also *PAS Communications, Inc. v. Sprint Corp.,* 139 F. Supp. 2d 1149, 1186 (D. Kan. 2001) (statistics that defendant did not achieve stated goal for granting minority contracts of little probative value without evidence showing the number of qualified minority applicants).  Indeed, Defendant's evidence shows the Human Resources director cannot remember any black applicants in the last 20 years for the front office positions.  Without knowing how many qualified black individuals who applied for front office management positions, Plaintiff's statistics are incomplete and not probative of discrimination.

Furthermore, Defendant provides evidence that in 2003, black employees comprised five percent of its workforce.  This is significant because the black population of the two counties in which Defendant has plants are 4.7% and 0.9%; thus, Defendant employs a higher percentage of blacks than live in the area.  See *Fowler v. Blue Bell, Inc.*, 737 F.2d 1007 ,1013 n.4 (11th Cir. 1984) (statistical evidence showing that defendant employed a greater percentage of blacks than were employed in the workforce of the county buttressed the finding that the company did not discriminate).  Plaintiff's statistical evidence is insufficient raise a genuine issue of material fact

from which a jury could infer a discriminatory motive.

E.  KHRC Letter of Probable Cause.

Plaintiff agues that the KHRC's probable cause finding is sufficient for a reasonable juror to find a pretext for discrimination.  The Court disagrees.  As discussed earlier, the out of court statements supporting the KHRC probable cause finding are inadmissible evidence.  A favorable letter from the KHRC does not create a genuine issue of material fact when it is unsupported by the evidence before this Court.  *Simms*, 165 F.3d at 1331 (when the independent facts before the district court judge fail to establish a genuine issue of material fact, a favorable EEOC letter of determination does not create one).

Defendant's Motion for Summary Judgment (Doc. 74) is GRANTED.  The Clerk is directed to enter Judgment for Defendant.

SO ORDERED this 27th  day of September 2006.

  s/ Wesley E. Brown                                   

Wesley E. Brown, U.S. Senior District Judge